**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN MICHAELS, BRIAN OLINGER, HARRY NICOLETTI, TORY KELLY, and BRUCE LOWTHER, | ) ) ) ) | Case No. |
| Plaintiffs, | ) ) | **COMPLAINT** |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| JOHN E. WETZEL, individually as Secretary for the Pennsylvania Department of Corrections; SHIRLEY MOORE SMEAL, individually as former Secretary for the Pennsylvania Department of Corrections; GARY HILER, individually as an Investigator of the Office of Special Investigations and Intelligence; MICHAEL KONDAS, individually as an Investigator of the Office of Special Investigations and Intelligence; MELVIN LOCKETT, individually as former Superintendent of SCI-Pittsburgh; DANIEL BURNS, individually as current Superintendent of SCI-Pittsburgh. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendant. | ) ) | |

Plaintiffs, JOHN MICHAELS, BRIAN OLINGER, HARRY NICOLETTI, TORY KELLY, and BRUCE LOWTHER, by and through undersigned counsel of record, file this Complaint, and allege as follows:

**NATURE OF ACTION**

1.  This matter arises from employment suspensions levied upon multiple Corrections Officers by the Pennsylvania Department of Corrections ("PDOC") during 2011 and 2012.

2.  Plaintiffs in this action are five individuals formerly employed as Corrections Officers by PDOC. Defendants include certain individuals employed, or formerly employed, by PDOC.

3.  PDOC suspended Plaintiffs indefinitely and without pay in 2011, but never told Plaintiffs why they were suspended, or how long their suspensions would last.

4.  Instead, PDOC kept Plaintiffs in the dark until it finally scheduled various Pre-Disciplinary Conferences between eleven and twenty-one months later.

5.  In February 2012, an arbitrator found this delay denied Plaintiffs constitutional due process rights because they were not given any opportunity to challenge their suspensions before losing pay and benefits status.

6.  Plaintiffs were terminated within one month of their sham Pre-Disciplinary Conferences.

7.  Now, Plaintiffs seek relief for this denial of due process, and the economic damages, anxiety, and illnesses they suffered as a result of these constitutional abuses and the public notoriety this matter received.

8.  A cause of action for Malicious Prosecution is also provided for Plaintiff Olinger.

**JURISDICTION AND VENUE**

9.  This action is brought under 42 U.S.C. § 1983 and the Fourteenth Amendment of the U.S. Constitution. Jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

10. Venue is proper under 28 U.S.C. § 1391(b). PDOC is an agency of the Commonwealth of Pennsylvania, which maintains a place of business in this judicial district. The individual

Defendants are agents of PDOC and residents within this judicial district. The events giving rise to this action took place in this judicial district.

## PARTIES

11. Plaintiffs are Pennsylvania residents and reside in this district. Plaintiffs were employed as Corrections Officers at the State Correctional Institution of Pittsburgh ("SCI-Pittsburgh"), a division of PDOC. As such, Plaintiffs are members of the Pennsylvania State Corrections Officers Association ("PSCOA"). Plaintiffs were denied their constitutional rights to procedural due process when Defendants suspended Plaintiffs indefinitely, without pay or explanation.

12. Defendant Gary Hiler is an Investigator of the Office of Special Investigations and Intelligence ("OSII"), a division of PDOC. Defendant Hiler personally denied Plaintiffs due process by recommending to the Defendant Superintendents that they deny Plaintiffs their rights to Pre-Disciplinary Conferences, or some other opportunity to be heard and challenge unspecified and untrue allegations against them.

13. Defendant Michael Kondas, upon Plaintiff's information and belief, is an OSII Investigator. Defendant Kondas personally denied Plaintiffs due process by recommending to the Defendant Superintendents that they deny Plaintiffs their rights to Pre-Disciplinary Conferences, or some other opportunity to be heard and challenge unspecified and untrue allegations against them.

14. Defendant Melvin Lockett was Superintendent of SCI-Pittsburgh, a division of PDOC. Defendant Lockett personally denied Plaintiffs due process by endorsing the recommendations of the Defendant Investigators to the acting PDOC Secretary.

15. Defendant Daniel Burns was, at times material hereto, the Superintendent of SCI-Pittsburgh. Defendant Burns personally denied Plaintiffs due process by endorsing the recommendations of the Defendant Investigators to the acting PDOC Secretary.

16. Defendant Shirley Moore Smeal was Secretary of PDOC. Defendant Smeal personally denied Plaintiffs due process by deciding, on the advice of the Defendant Superintendents and Investigators, not to grant them Pre-Disciplinary Conferences, or some other opportunity to be heard and challenge unspecified and untrue allegations against them, before putting Plaintiffs on indefinite suspensions without pay.

17. Defendant John E. Wetzel is the current Secretary of PDOC. Defendant Wetzel personally denied Plaintiffs due process by deciding, on the advice of the Defendant Superintendents and Investigators, to keep and continue Plaintiffs on their indefinite suspensions without pay, and without granting them Pre-Disciplinary Conferences, or some other opportunity to be heard and challenge unspecified and untrue allegations against them.

## FACTUAL BACKGROUND

### THE SUSPENSIONS

18. Paragraphs 1 through 17 of the Complaint are incorporated herein by reference.

19. Plaintiffs' cause of action begins with Defendants' abrupt decision to suspend Plaintiff Harry Nicoletti indefinitely in January 2011, without pay or explanation.

20. Three months later, under the same swift cloak of secrecy, Defendants suspended Plaintiffs John Michaels, Brian Olinger, and Tory Kelly indefinitely, without pay or explanation.

21. Eight months later, Defendants did the same to Plaintiff Bruce Lowther.

22. Defendants intentionally kept Plaintiffs in the dark about their suspensions.

23. PSCOA filed Grievance Reports for Plaintiff Nicoletti in February 2011, and for Plaintiffs Michaels, Olinger, and Kelly in June 2011.

24. Eventually, a Criminal Complaint was filed against Plaintiff Nicoletti. This Complaint implicated Plaintiffs in some fabricated inmate-created conspiracy theory, and represented the first explanation, of any kind, that Plaintiffs received about their suspensions.

25. Months later, Criminal Complaints were filed against Plaintiffs Olinger, Kelly, and Lowther. No criminal charges were ever filed against Plaintiff Michaels.

26. These criminal charges presented some of the Plaintiffs, for the first time, with a limited, albeit constitutionally inadequate, opportunity to defend themselves in their community, but not to their employer, PDOC.

### THE SO-CALLED "INVESTIGATION" BEHIND THE SUSPENSIONS

27. Paragraphs 1 through 26 of the Complaint are incorporated herein by reference.

28. Criminal charges were filed against some Plaintiffs because they happened to work on F-Block at SCI-Pittsburgh in 2010.

29. F-Block is the reception unit at SCI-Pittsburgh and is utilized to house new inmates.

30. In 2010, Inmate Jerry Shoemaker, a convicted child sex abuser, reported that he was "sexually propositioned by a staff member" during his brief incarceration at SCI-Pittsburgh F-Block.

31. Inmate Shoemaker's complaint was referred to PDOC's OSII, where Defendants Hiler and Kondas were assigned to conduct an investigation.

32. In the course of this investigation, Defendants stoked Inmate Shoemaker's initial claim to morph uncontrollably into a baseless conspiracy that SCI-Pittsburgh Corrections Officers sought

out incarcerated child sex abusers and subjected them to violence and sexually invasive conduct on F-Block.

33. This phenomenal conspiracy theory was based entirely upon the unsubstantiated and radically inconsistent stories told by various inmates questioned by Defendants Hiler and Kondas. Defendants Hiler and Kondas sought out these inmates because of their status as convicted child sex abusers, like Shoemaker, and because at one time or another, they were "Plaintiffs' prisoners" at F-Block.  Defendants Hiler and Kondas chose not to question Plaintiffs, but instead relied solely on the obviously incredible testimony of the inmate child sex abusers who had every motive to use the investigation as an opportunity to "get back at" Plaintiffs simply because Plaintiffs were their guards.

34. Over time, some of the convicted sex abusers that Defendants interviewed named Plaintiffs as being somehow involved in this snowballing conspiracy. At no point during this investigation did Defendants ask Plaintiffs about the allegations against them.

35. Defendants Hiler and Kondas questioned Inmate Kenneth Vanwy, who was a convicted child sex abuser housed at SCI-Pittsburgh in 2010. Inmate Vanwy supposedly told Defendants Hiler and Kondas at that time that Plaintiff Nicoletti punched, smacked, spat, and threw water on him, and ordered him to strip naked and attempted to shove a broomstick up Inmate Vanwy's rectum. Plaintiff Nicoletti was physically incapable of such conduct and this would have been visibly apparent to Defendants Hiler and Kondas.

36. Later, Inmate Vanwy admitted during a criminal hearing that he was never assaulted, and in fact, confidently misidentified a lawyer present at the hearing as one of the guards who allegedly treated him poorly.

37. Defendants Hiler and Kondas also interviewed Inmate Casey Oliver, who claimed Plaintiff Nicoletti sought out and abused new inmates convicted of sex offenses involving children.

38. Later, Inmate Oliver also testified at a criminal hearing. Inmate Oliver's testimony starkly contradicts inmate Vanwy's testimony and was unconvincing to the District Magistrate (as it should have been to Defendants Hiler and Kondas) who dismissed all charges.

39. Based upon the advice, influence, and recommendations of Defendants Hiler and Kondas, and endorsements of Defendant Superintendent Lockett, Defendants Secretary Smeal and Superintendent Lockett abruptly suspended Plaintiffs indefinitely, without pay or explanation. Defendant Superintendent Lockett communicated his decision to Plaintiffs in writing.

40. Plaintiffs were never questioned during Defendants' investigation about the inherently unreliable and biased charges made by some of their former inmates.

41. Plaintiff's first opportunity to defend themselves against these concocted prisoner allegations occurred during Pre-Disciplinary Conferences in 2012. Defendants scheduled these Pre-Disciplinary Conferences only after Official Grievance Reports were filed, criminal charges brought, and compulsory arbitration decisions issued which established that the failure to conduct these Pre-Disciplinary Conferences violated the Plaintiff's constitutional rights.

<u>THE PRE-DISCIPLINARY CONFERENCES AND TERMINATIONS</u>

42. Paragraphs 1 through 41 of the Complaint are incorporated herein by reference.

43. Plaintiff Nicoletti first learned of the preposterous administrative charges against him when his Pre-Disciplinary Conference was finally scheduled in September 2012—one year and nine months after Defendants suspended him without pay or explanation.

44. Upon the advice and recommendation of Defendants Hiler and Kondas, as endorsed by the Defendant Superintendents, neither Defendant Secretary Smeal nor the Defendant Superintendents ever granted Plaintiff Nicoletti an opportunity to be heard, and Defendant Secretary Wetzel and the Defendant Superintendents waited to schedule Plaintiff Nicoletti's Pre-Disciplinary Conference until after criminal charges were filed against Plaintiffs Olinger, Nicoletti, Kelly, and Lowther.

45. Insofar as his long-delayed Pre-Disciplinary Conference was concerned, Defendants' calculated delay made Plaintiff Nicoletti choose between (1) saving his job and answering Defendants' questions at his Pre-Disciplinary Conference, and (2) remaining silent at his Pre-Disciplinary Conference and preserving his interests in his pending criminal case.

46. Shortly after his sham Pre-Disciplinary Conference, Defendant Superintendent Burns, with the backing of Defendant Secretary Wetzel, terminated Plaintiff Nicoletti for a fabricated violation of PDOC's administrative policies and Code of Ethics.

47. Plaintiffs Michaels and Olinger first learned of the preposterous administrative charges against them when their Pre-Disciplinary Conferences were finally scheduled in February 2012—eleven months after Defendants suspended them indefinitely and without pay or explanation.

48. Upon the advice and recommendation of Defendants Hiler and Kondas, as endorsed by the Defendant Superintendents, neither Defendant Secretary Smeal nor the Defendant Superintendents ever granted Plaintiffs Michaels and Olinger an opportunity to be heard, and Defendant Secretary Wetzel and the Defendant Superintendents waited to schedule their Pre-Disciplinary Conference until after criminal charges were filed.

49. Thus, Defendants' calculated delay made Plaintiffs Michaels and Olinger choose between (1) saving their jobs and answering Defendants' questions at their Pre-Disciplinary Conferences, and (2) remaining silent at their Pre-Disciplinary Conferences and preserving their interests in pending, or potential, criminal cases.

50. Shortly after these sham Pre-Disciplinary Conferences, Defendant Superintendent Burns, with the backing of Defendant Secretary Wetzel, terminated Plaintiffs Michaels and Olinger for a fabricated violation of PDOC's policies and Code of Ethics.

51. Plaintiff Kelly first learned of the preposterous administrative charges against him when Defendants finally scheduled his Pre-Disciplinary Conference in March 2012—almost one full year after Defendants suspended him indefinitely, without pay or explanation.

52. Upon the advice and recommendation of Defendants Hiler and Kondas, as endorsed by the Defendant Superintendents, neither Defendant Secretary Smeal nor the Defendant Superintendents ever granted Plaintiff Kelly an opportunity to be heard, and Defendant Secretary Wetzel waited to schedule his Pre-Disciplinary Conference until after criminal charges were filed against Plaintiffs Olinger, Nicoletti, Kelly, and Lowther.

53. Thus, Defendants' calculated delay made Plaintiff Kelly choose between (1) saving his job and answering Defendants' questions at his Pre-Disciplinary Conference, and (2) remaining silent at his Pre-Disciplinary Conference and preserving his interests in his pending criminal case.

54. Defendant Superintendent Burns, with the backing of Defendant Secretary Wetzel, terminated Plaintiff Kelly in September 2012 for a fabricated violation of various paragraphs of PDOC's administrative policies and Code of Ethics.

55. Plaintiff Lowther learned of the preposterous administrative charges against him when Defendants finally scheduled his Pre-Disciplinary Conference in September 2012—eleven (11) months after Defendants suspended him indefinitely, and without pay or explanation.

56. Upon the advice and recommendation of Defendants Hiler and Kondas, as endorsed by the Defendant Superintendents, neither Defendant Secretary Smeal not the Defendant Superintendents ever granted Plaintiff Lowther an opportunity to be heard, and Defendant Secretary Wetzel waited to schedule his Pre-Disciplinary Conference until after criminal charges were filed against Plaintiffs Olinger, Nicoletti, Kelly, and Lowther.

57. Thus, Defendants' calculated delay made Plaintiff Lowther choose between (1) saving his job and answering Defendants' questions at his Pre-Disciplinary Conference, and (2) remaining silent at his Pre-Disciplinary Conference and preserving his interests in his pending criminal case.

58. After this sham Pre-Disciplinary Conference, Defendant Superintendent Burns, with the backing of Defendant Secretary Wetzel, terminated Plaintiff Lowther for a fabricated violation of various paragraphs of PDOC's policies and Code of Ethics.

<u>THE ARBITRATOR'S DECISION</u>

59. Paragraphs 1 through 58 of the Complaint are incorporated herein by reference.

60. A binding arbitration hearing was held between PDOC and Pennsylvania State Corrections Officers Association ("PSCOA"), on behalf of Plaintiffs Michaels, Olinger, Nicoletti, and Kelly's ("Grievants"), in October 2011.

61. Arbitrator Ronald F. Talarico, Esq., issued his Opinion in February 2012.

62. Arbitrator Talarico disposed of the following issue: "Whether the Commonwealth violated the Grievants' due process rights in issuing the suspensions pending investigation?"

63. In disposing of this issue, Arbitrator Talarico provided:

a. The Civil Service Act (71 P.S. § 741.807) and Article 26 of the parties' collective bargaining agreement ("CBA") expressly provide that Grievants, as Corrections Officers, possess a property right in their continued employment and, thus, cannot be suspended without just cause.

b. Section 2 of the CBA provides, "Any action instituted under Section 1 of this Article shall be implemented within a reasonable period of time after the event giving rise to such disciplinary action or knowledge thereof."

c. "All eight Grievants have been indefinitely suspended without pay for what the Employer agrees was willful behavior which it deems undesirable. More importantly, the Employer [PDOC] admits that all eight Grievants have been suspended without being provided one scintilla of information as to why that action was being taken, nor without the briefest of opportunities to offer information to challenge this action...No such opportunities were provided to any of the eight Grievants **prior** to their removal from pay status" (emphasis in the original).

d. "...removal from pay status and benefits under these circumstances is, in the final analysis, a deprivation of a substantial property interest to which, at a minimum, the barest essentials of procedural due process must attach.

...

Clearly no logical or reasonable basis exists to justify [Defendants'] inaction and lack of constitutionally guaranteed protections."

e. Defendants argued that this was simply an "extraordinary circumstance'" that is beyond the scope of all current case law. Arbitrator Talarico disagreed.

"There is no question that the **allegations** of misconduct against the Grievants are extremely serious and involve charges of not only violence but sexually invasive conduct against inmates. An internal investigation was <u>initiated</u> by [Defendants], which it subsequently turned over to the Allegheny County District Attorney's Office for possible prosecution of the subjects of the investigation (emphasis in the original).

...

The Commonwealth has failed to establish that [Defendants] could not lawfully reveal any information whatsoever from its investigation to either the Grievants or to their Association Representatives. The Commonwealth has also failed to explain why such information could not have been provided to this Arbitrator in a proceeding

which took place weeks <u>after</u> a highly detailed Criminal Complaint was filed against Nicoletti and made public. That Criminal Complaint contained sufficient information which would allow anyone with a working knowledge of SCI-Pittsburgh to decipher what had taken place – if strict secrecy was still such a concern (emphasis in the original).

...

Furthermore, it is important to note that [Defendants] did not initiate its investigation at the direction of the Grand Jury, nor did it suspend the Grievants at the direction of the Grand Jury.

...

Accordingly, I find the existence of the Grand Jury investigation does not constitute the type of 'extraordinary circumstances' which would allow [Defendants] to circumvent the mandates of the U.S. Constitution to provide even minimal due process rights to the Grievants <u>prior</u> to their suspensions" (emphasis in original).

    f.   Arbitrator Talarico thus provided in the Award, "The grievances are hereby sustained to the extent the Grievants are found to have been improperly suspended in violation of their constitutional rights to procedural due process."

## CLAIMS FOR RELIEF

64. Paragraphs 1 through 63 of the Complaint are incorporated herein by reference.

65.  The U.S. Constitution does not create property interests. State law creates property rights protected by the Fourteenth Amendment. <u>Board of Regents v. Roth</u>, 408 U.S. 564 (1972).

66. Plaintiffs are civil service employees under the Civil Service Act. 71 P.S. §741.803

67. The Third Circuit has held that due process protections apply to civil service employees in Pennsylvania. <u>Dee v. Borough of Dunmore</u>, 549 F.3d 225 (3rd Cir. 2008).

68. "[I]t is beyond dispute that a contract with a state entity can give rise to a property right protected by the 14th Amendment." <u>Unger v. National Residents</u>, 928 F.2d 1392 (3rd Cir. 1991).

69. A collective bargaining agreement exists between PDOC and PSCOA, of which Plaintiffs are members.

70. Thus, Plaintiffs have a property interest in their employment with PDOC.

71. PDOC admitted during binding arbitration that it suspended Plaintiffs indefinitely and without pay or the briefest of opportunities to challenge that action.

72. In causing PDOC to deny Plaintiffs the opportunity to challenge their indefinite and unspecified suspensions, Defendants denied Plaintiffs even the minimal due process rights owed to them under the Fourteenth Amendment and binding case law.

73. Defendants Hiler and Kondas violated Plaintiffs' due process rights by telling the other Defendants to block the notice and Pre-Disciplinary Conferences owed to Plaintiffs until charges were eventually filed, at which time Plaintiffs would be unable to save their reputations and jobs in the wake of rank publicity perpetuated by said Defendants in the long hiatus between their suspensions and Pre-Disciplinary Conferences.

74. Defendants Superintendent Lockett and Superintendent Burns violated Plaintiffs' due process rights by endorsing the recommendations of Defendants Hiler and Kondas, and recommending the same to Defendant Secretaries Smeal and Wetzel.

75. Defendant Secretary Smeal violated Plaintiffs' due process rights by never granting them an opportunity to respond to the administrative charges against them before or immediately after they were suspended indefinitely without pay or explanation.

76. Defendant Secretary Wetzel violated Plaintiffs' due process rights by never granting them an opportunity to respond to the administrative charges against them until it was too late to fight off baseless terminations and criminal charges.

77. Defendants, under the facts alleged in Plaintiffs' Complaint and the Third Circuit's decision in Schmidt v. Creedon, 639 F.3d 587 (3rd Cir. 2011), are not entitled to immunity.

78. The actions of these Defendants, jointly and severally, are wanton, and entitle Plaintiffs to an award of exemplary and punitive damages.

## Count I

**John Michaels v. Gary Hiler, Michael Kondas, Melvin Lockett, Daniel Burns, John E. Wetzel, and Shirley Moore Smeal**

**42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution— Procedural Due Process**

79. Paragraphs 1 through 78 of the Complaint are incorporated herein by reference.

80. In April 2011, Defendant Melvin Lockett, Superintendent of SCI-Pittsburgh, notified Plaintiff Michaels he was suspended. Defendants Hiler and Kondas led an internal investigation behind this suspension, and Defendant Secretary Smeal made or otherwise largely contributed in the decision to suspend Plaintiff Michaels without due process in the first place.

81. For eleven months, Plaintiff Michaels was kept in the dark. Then in February 2012, he received a letter from the new SCI-Pittsburgh Superintendent, Defendant Daniel Burns. This letter finally informed Plaintiff Michaels of the administrative charges against him.

82. Although based on inconsistent, incredible and inherently biased inmate testimony, Defendant Burns' letter somehow offered closure to the agonizing limbo in which Plaintiff Michaels had suffered for almost a year.

83. Defendants' denial of due process caused Plaintiff Michaels' termination, because Plaintiff Michaels was never given the opportunity to defend himself until it was too late to refute the administrative charges made against him by some inherently biased inmates with an axe to grind.

84. Because of Defendants' delayed notice, and the public notoriety covering the matter, Plaintiff Michaels requires constant medication through anti-anxiety and anti-depression drugs.

But, because medical insurance was a benefit of his employment with PDOC that he lost when he was unconstitutionally suspended, Plaintiff Michaels has to pay for his prescription medications and medical treatment out-of-pocket.

85. Plaintiff Michaels has lost more than 50 pounds since his suspension. This weight loss stems from the anxiety he suffers because of scandalous public attention this matter received that festered in the months and months during which Defendants deprived him of his constitutional rights. He is overwhelmed with mental anguish and humiliation from being affiliated with the same.

86. Plaintiff Michaels has not obtained alternate employment because of his ongoing anxiety.

87. After the decision of Arbitrator Talarico, Plaintiff Michaels received a partial payment for some of the income he lost during his suspension, but he never received compensation for certain types of pay. This compensation includes the amounts described below, as adjusted, where necessary, to their present value:

a.   The amount of increased pay he would have received in the form of increases in his hourly rate of pay after the date he was *suspended* and into the future, but for the fact Defendants' denial of his due process caused his termination;

b.   The overtime pay he would have accumulated after the date he was *suspended* and into the future, but for the fact Defendants' denial of his due process caused his termination;

c.   The sick pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

d.   The holiday pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination; and

e.   The vacation time pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

f.   The leave pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination; and

g.   The shift differential pay he would have accumulated after the date he was *suspended* and into the future, but for the fact that Defendants denied his due process rights that caused his termination.

88. PDOC withheld retirement contributions from Plaintiff Michaels' pay, and made matching contributions to his pension during his employment. However, if Plaintiff Michaels tries to cash out his pension, he will be forced to pay a penalty. Because Plaintiff Michaels should still be employed, and PDOC should still be matching his retirement contributions, Plaintiff Michaels is entitled to an amount equal to the present-day value of PDOC's total matching contributions from the date of Plaintiff Michaels' suspension and until he reaches the age of retirement. Plaintiff Michaels is also entitled to an amount equal to any penalty he might face in cashing out his pension.

WHEREFORE, Plaintiff Michaels prays that this Court enter a judgment against Defendants, in an amount to be determined by this Court, plus costs, interest, and attorney's fees.

### Count II

**Brian Olinger v. Gary Hiler, Michael Kondas, Melvin Lockett, Daniel Burns, John E. Wetzel, and Shirley Moore Smeal**

**42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution— Procedural Due Process**

89.  Paragraphs 1 through 88 of the Complaint are incorporated herein by reference.

90. In April 2011, Defendant Melvin Lockett, Superintendent of SCI-Pittsburgh, notified Plaintiff Olinger he was suspended. Defendants Hiler and Kondas led an internal investigation behind this suspension, and Defendant Secretary Smeal made or otherwise largely contributed in the decision to suspend Plaintiff Olinger without due process in the first place.

91. For eleven months, Plaintiff Olinger was kept in the dark. Then in February 2012, he received a letter from the new SCI-Pittsburgh Superintendent, Defendant Daniel Burns. This letter finally informed Plaintiff Olinger of the administrative charges against him.

92. Although based on inconsistent, incredible and inherently biased inmate testimony, Defendant Burns' letter somehow offered closure to the agonizing limbo in which Plaintiff Olinger had suffered for almost a year.

93. Defendants' eleven-month denial of due process caused Plaintiff Olinger's termination because Plaintiff Olinger was never given the opportunity to defend himself until it was too late to refute the administrative charges made against him by some inherently biased inmates with an axe to grind.

94. Plaintiff Olinger lost the family medical insurance PDOC provided. Although he gets medical benefits from his new employer, Plaintiff Olinger cannot afford the cost of insurance for his wife and children. Plaintiff Olinger is thus forced to seek public assistance, and cannot help but feel overwhelmed by humiliation for this fact on a daily basis.

95. Plaintiff Olinger suffers disabling mental anguish as a result of the public notoriety this matter has received and the detrimental effect it has had on his family. Plaintiff Olinger was criminally charged and arrested without probable cause as a result of Defendants' secret investigation, and even though these charges were summarily dismissed, he has been humiliated for being associated with the same.

96. Plaintiff Olinger incurred costs in the amount of about $4,000 to defend of these baseless criminal charges.

97. Plaintiff Olinger found alternate employment in the oil and gas industry. This job does not compensate Plaintiff Olinger at the rate he received from PDOC. Thus, Plaintiff Olinger is entitled to an amount equal to the present value of the difference between the aggregate income, adjusted by "shift differential increased hourly rate of pay," he would have earned at PDOC from the date of his suspension until he reaches retirement age, and the same at his current job.

98. After the decision of Arbitrator Talarico, Plaintiff Olinger received a partial payment for some of the income he lost during his suspension, but he never received compensation for certain types of pay. This compensation includes the amounts described below, as adjusted, where necessary, to their present value:

a. The overtime pay he would have accumulated after the date he was *suspended* and into the future, but for the fact Defendants' denial of his due process caused his termination;

b. The sick pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

c. The holiday pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

d. The vacation time pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

e. The leave pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination; and

f.   The shift differential pay he would have accumulated after the date he was *suspended* and into the future, but for the fact that Defendants denied his due process rights that caused his termination.

99. PDOC withheld retirement contributions from Plaintiff Olinger's pay, and made matching contributions to his pension during his employment. However, after his unconstitutional suspension and termination, Plaintiff Olinger fell upon incredible financial hardship and was forced to cash out his retirement pension. In doing so, Plaintiff Olinger was forced to pay a penalty. Because Plaintiff Olinger should still be employed, and PDOC should still be matching his retirement contributions, Plaintiff Olinger is entitled to an amount equal to the present-day value of PDOC's total matching contributions from the date of Plaintiff Olinger's suspension and until he reaches the age of retirement. This amount, of course, must also be offset by any matching pension contributions his current employer makes. Plaintiff Olinger is also entitled to an amount equal to the penalty he paid in cashing in his pension during the financial hardship Defendants created.

100.   Because Defendants denied Plaintiff Olinger due process during his suspension, Plaintiff Olinger was unable to pay the financing payments of his car and it was repossessed. Plaintiff Olinger is entitled to an amount from Defendants that will allow him to put a down payment equal to the amount he had paid down on his repossessed car.

WHEREFORE, Plaintiff Olinger prays that this Court enter a judgment against Defendants in an amount to be determined by this Court, plus costs, interest, and attorney's fees.

## Count III

**Harry Nicoletti v. Gary Hiler, Michael Kondas, Melvin Lockett, Daniel Burns, John E. Wetzel, and Shirley Moore Smeal**

**42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution—Procedural Due Process**

101.  Paragraphs 1 through 100 of the Complaint are incorporated herein by reference.

102.  In January 2011, Defendant Melvin Lockett, Superintendent of SCI-Pittsburgh, notified Plaintiff Nicoletti he was suspended. Defendants Hiler and Kondas led an internal investigation behind this suspension, and Defendant Secretary Smeal made or otherwise largely contributed in the decision to suspend Plaintiff Nicoletti without due process in the first place.

103.  For more than a year, Plaintiff was kept in the dark. Then, Plaintiff Nicoletti received a letter from Defendants notifying him of the administrative charges against him.

104.  Although based on inconsistent, incredible and inherently biased inmate testimony, Defendants' letter somehow offered closure to the agonizing limbo in which Plaintiff Nicoletti had suffered for almost two years.

105.  Defendants' incredible denial of due process caused Plaintiff Nicoletti's termination because Plaintiff Nicoletti was never given a chance to defend himself until it was too late to refute the administrative charges made against him by some inherently biased inmates with an axe to grind.

106.  Plaintiff Nicoletti lost his medical insurance with PDOC. Plaintiff Nicoletti has since been forced to pay an extra $400.00 a month for health insurance through his wife's plan.

107.  Plaintiff Nicoletti suffers disabling mental anguish and humiliation from the notoriety this matter received and its effect on his family as a result of the deprivation of his constitutional

rights by the Defendants. The U.S. Social Security Administration deemed Plaintiff Nicoletti disabled, and he medicates constantly through anti-anxiety drugs.

108.  Plaintiff Nicoletti's disability does not equal his hourly wage from PDOC, and he has not obtained alternate employment.

109.  After the decision of Arbitrator Talarico, Plaintiff Nicoletti received a partial payment for some of the income he lost during his suspension, but he never received compensation for certain types of pay. This compensation includes the amounts described below, as adjusted, where necessary, to their present value:

a.  The amount of increased pay he would have received in the form of increases in his hourly rate of pay after the date he was *suspended* and into the future, but for the fact Defendants' denial of his due process caused his termination;

b.  The overtime pay he would have accumulated after the date he was *suspended* and into the future, but for the fact Defendants' denial of his due process caused his termination;

c.  The sick pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

d.  The holiday pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination; and

e.  The vacation time pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

f.  The leave pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination; and

g.   The shift differential pay he would have accumulated after the date he was *suspended* and into the future, but for the fact that Defendants denied his due process rights that caused his termination.

110. PDOC withheld retirement contributions from Plaintiff Nicoletti's pay, and made matching contributions to his pension during his employment. However, if Plaintiff Nicoletti tries to cash out his pension, he will be forced to pay a penalty. Because Plaintiff Nicoletti should still be employed, and PDOC should still be matching his retirement contributions, Plaintiff Nicoletti is entitled to an amount equal to the present-day value of PDOC's total matching contributions from the date of Plaintiff Nicoletti's suspension and until he reaches the age of retirement. Plaintiff Nicoletti is also entitled to an amount equal to any penalty he might face in cashing out his pension.

111. A lien was placed on Plaintiff Nicoletti's residence as a condition of bail. Plaintiff Nicoletti and his wife tried to take out a consolidation loan, but were denied because the lien prevented them from using their real estate as collateral. They are thus paying an interest rate that exceeds 20%. This rate would be much lower were it not for Defendants' denial of due process, which resulted in Plaintiff Nicoletti's termination and pending criminal charges.

112. For the same reasons, Plaintiff Nicoletti incurred significant costs in hiring a criminal defense attorney, a civil attorney to defend against civil suits, and bail bonds.

WHEREFORE, Plaintiff Nicoletti prays that this Court enter a judgment against Defendants, in an amount to be determined by this Court, plus costs, interest, and attorney's fees.

## Count IV

**Tory Kelly v. Gary Hiler, Michael Kondas, Melvin Lockett, and Daniel Burns, John E. Wetzel, and Shirley Moore Smeal**

**42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution—Procedural Due Process**

113.  Paragraphs 1 through 112 of the Complaint are incorporated herein by reference.

114.  In April 2011, Defendant Melvin Lockett, Superintendent of SCI-Pittsburgh, notified Plaintiff Kelly that he was suspended. Defendants Hiler and Kondas led an internal investigation behind this suspension, and Defendant Secretary Smeal made or otherwise largely contributed in the decision to suspend Plaintiff Kelly without due process in the first place.

115.  For almost a year, Plaintiff Kelly was kept in the dark. Then, finally, he received a letter from Defendants that informed Plaintiff Kelly of the administrative charges against him.

116.  Although based on inconsistent, incredible and inherently biased inmate testimony, Defendants' letter somehow offered closure to the agonizing limbo in which Plaintiff Kelly had suffered for almost a year.

117.  Defendants' denial of due process caused Plaintiff Kelly's termination, because Plaintiff Kelly was never given the opportunity to defend himself until it was too late to refute the administrative charges made against him by some inherently biased inmates with an axe to grind.

118.  As a result of Defendants' yearlong denial of procedural due process, and the public notoriety covering this matter, Plaintiff Kelly now suffers mental anguish and humiliation.

119.  Because of his anguish, Plaintiff Kelly has not obtained alternate employment.

120.  Plaintiff Kelly lost his medical benefits when PDOC suspended him indefinitely and without pay. He cannot afford the cost of obtaining medical insurance.

121.  After the decision of Arbitrator Talarico, Plaintiff Kelly received a partial payment for some of the income he lost during his suspension, but he never received compensation for certain types of pay. This compensation includes the amounts described below, as adjusted, where necessary, to their present value:

a.   The amount of increased pay he would have received in the form of increases in his hourly rate of pay after the date he was *suspended* and into the future, but for the fact Defendants' denial of his due process caused his termination;

b.   The overtime pay he would have accumulated after the date he was *suspended* and into the future, but for the fact Defendants' denial of his due process caused his termination;

c.   The sick pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

d.   The holiday pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination; and

e.   The vacation time pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

f.   The leave pay he had already accumulated and would have continued to accumulate after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination; and

g.   The shift differential pay he would have accumulated after the date he was *suspended* and into the future, but for the fact that Defendants denied his due process rights that caused his termination.

122.  PDOC withheld retirement contributions from Plaintiff Kelly's pay, and made matching contributions to his pension during his employment. In 2012, Plaintiff Kelly fell into financial

despair and tried to cash out his pension, despite the large penalty incurred by doing so. However, Plaintiff has been denied the chance to cash out his pension because of Defendants' denial of due process, and the pending criminal action that denial produced. Because Plaintiff Kelly should still be employed, and PDOC should still be matching his retirement contributions, Plaintiff Kelly is entitled to an amount equal to the present-day value of PDOC's total matching contributions from the date of Plaintiff Kelly's suspension and until he reaches the age of retirement. Plaintiff Kelly is also entitled to an amount equal to any penalty he might face in cashing out his pension.

123. Plaintiff Kelly also incurred significant costs for bail and a criminal defense attorney.

WHEREFORE, Plaintiff Kelly prays that this Court enter a judgment against Defendants in an amount to be determined by this Court, plus costs, interest, and attorney's fees.

## Count V

**Bruce Lowther v. Gary Hiler, Michael Kondas, Melvin Lockett, and Daniel Burns John E. Wetzel, and Shirley Moore Smeal**

**42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution— Procedural Due Process**

124. Paragraphs 1 through 123 of the Complaint are incorporated herein by reference.

125. In November 2011, PDOC notified Plaintiff Lowther that he was suspended pending an investigation. Defendants Hiler and Kondas led an internal investigation behind this suspension, and Defendant Secretary Smeal made or otherwise largely contributed in the decision to suspend Plaintiff Lowther without due process in the first place.

126. For almost a year, Plaintiff Lowther was kept in the dark. Then, finally, he received a letter from Defendants that informed Plaintiff Lowther of the administrative charges against him.

127. Although based on inconsistent, incredible and inherently biased inmate testimony, Defendants' letter somehow offered closure to the agonizing limbo in which Plaintiff Lowther had suffered for almost a year.

128. Defendants' denial of due process caused Plaintiff Lowther's termination, because Plaintiff Lowther was never given the opportunity to defend himself until it was too late to refute the administrative charges made against him by some inherently biased inmates with an axe to grind.

129. As a result of Defendants' eleven-month denial of procedural due process, and the public notoriety covering this matter, Plaintiff Lowther now suffers disabling mental anguish. Plaintiff Lowther now requires constant medication through prescription anti-depression and insomnia drugs. This anguish, depression, insomnia, and humiliation cannot be undone.

130. Plaintiff Lowther was involved in a Chapter 13 bankruptcy during the course of PDOC's denial of his procedural due process. As a result, Plaintiff Lowther can no longer afford to fund the reorganization of his debts, and has had to convert his Chapter 13 bankruptcy into Chapter 7 bankruptcy liquidation. Now, Plaintiff Lowther's house, which would have been saved in a Chapter 13 bankruptcy, is in foreclosure.

131. After the decision of Arbitrator Talarico, Plaintiff Lowther received a partial payment for some of the income he lost during his suspension, but he never received compensation for certain types of pay. This compensation includes the amounts described below, as adjusted, where necessary, to their present value:

a. The amount of increased pay he would have received in the form of increases in his hourly rate of pay after the date he was *suspended* and into the future, but for the fact Defendants' denial of his due process caused his termination;

b.   The overtime pay he would have accumulated after the date he was *suspended* and into the future, but for the fact Defendants' denial of his due process caused his termination;

c.   The sick pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

d.   The holiday pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination; and

e.   The vacation time pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

f.   The leave pay he would have accumulated after the date he was *suspended*, and into the future, but for the fact Defendants' denial of his due process caused his termination;

g.   The shift differential pay he would have accumulated after the date he was *suspended* and into the future, but for the fact that Defendants denied his due process rights that caused his termination.

132. PDOC withheld retirement contributions from Plaintiff Lowther's pay, and made matching contributions to his pension during his employment. However, if Plaintiff Lowther tries to cash out his pension, he will be forced to pay a penalty. Because Plaintiff Lowther should still be employed, and PDOC should still be matching his retirement contributions, Plaintiff Lowther is entitled to an amount equal to the present-day value of PDOC's total matching contributions from the date of Plaintiff Lowther's suspension and until he reaches the age of retirement. Plaintiff Lowther is also entitled to an amount equal to any penalty he might face in cashing out his pension.

133. Plaintiff Lowther also incurred significant costs for bail and a criminal defense attorney.

WHEREFORE, Plaintiff Lowther prays that this Court enter a judgment against Defendants in an amount to be determined by this Court, plus costs, interest, and attorney's fees.

### Count VI

**Brian Olinger v. Gary Hiler**

**42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution—Malicious Prosecution**

134.  Paragraphs 1 through 133 of the Complaint are incorporated herein by reference.

135.  "A civil action for § 1983 malicious prosecution requires that: (1) the defendant initiate a criminal proceeding; (2) which ends in plaintiff's favor; (3) which was initiated without probable cause; and (4) the defendant acts maliciously or for a purpose other than bringing the defendant [sic] to justice. We have held that a claim for malicious prosecution is actionable under 42 U.S.C.A. § 1983 (citations omitted). Under these authorities, the section 1983 claim must include the elements of the common law tort as it has developed." Rose v. Bartle, 871 F.2d 331, 349 (3d Cir. Pa. 1989).

136.  Defendant Hiler initiated a criminal proceeding against Plaintiff Olinger by serving as the Affiant to his Criminal Complaint, and directing the criminal investigation behind it.

137.  District Justice King dismissed Defendant Hiler's Complaint against Plaintiff Olinger, and in Plaintiff Olinger's favor, on January 20, 2012.

138.  Defendant Hiler initiated the criminal proceeding into Plaintiff Olinger without probable cause. This is obvious from the wholly inconsistent testimony of the Commonwealth's star-witnesses during the hearing on January 20, 2012. District Justice King noted these glaring inconsistencies and lack of probable cause when he provided, "Based on the evidence and the two witnesses, Mr. Oliver and Mr. Vanwy, the testimony couldn't be further apart. At this time I am going to dismiss the charges."

139.  Defendant Hiler's malicious motivations are apparent from his refusal to provide even minimal due process to Plaintiff Olinger during his nearly two-year witch-hunt. Defendant Hiler's decision not to avail himself of evidence that would contradict his predetermined conclusions highlights his recklessness and decision to find a scapegoat at all costs, even in the face of justice.

140.  Defendant Hiler, under the Third Circuit's decision in <u>Schmidt v. Creedon</u>, 639 F.3d 587 (3rd Cir. 2011), is not entitled to qualified immunity.

141. Because of Defendant Hiler's malicious prosecution of Plaintiff Olinger, Plaintiff Olinger was first suspended indefinitely without pay, then lost his job; stripped of his family's medical insurance; suffers irreversible mental anguish and humiliation; has lost various other job related benefits; has incurred substantial legal costs and bail charges; and had his car repossessed.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury on all counts of this Complaint.

Respectfully submitted,

BY:

/s/Lawrence Fisher
Lawrence Fisher
Attorney for Plaintiff
Pa ID No.  67667
Cohen and Willwerth, P.C.
One Oxford Centre
301 Grant Street, Suite 4300
Pittsburgh, PA 15219
(724) 986-9785
(412) 255-3701
lawfirst@comcast.net